# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| MICHELLE L. SUDDUTH | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 03-0163-CV-W-FJG |
| | ) |
| MISSOURI DEPARTMENT OF SOCIAL | ) |
| SERVICES, et al., | ) |
| | ) |
| Defendants. | ) |

## ORDER

Currently pending before the Court is defendant's Motion for Summary Judgment (Doc. # 104) and plaintiff's Motions in Limine (Docs. # 128, 129).

## I. BACKGROUND

Plaintiff was initially employed by the Department of Social Services ("DSS") and was assigned to the Division of Child Support Enforcement ("DCSE") on December 21, 1998. Plaintiff was promoted to a Clerk/Typist II effective June 21, 1999. On July 5, 2000, plaintiff voluntarily resigned her position with DCSE. Plaintiff resigned in good standing. Late in July 2000, plaintiff spoke with Rhonda Jones, her immediate supervisor, about obtaining reemployment with DCSE. Jones spoke with Martha Morris, a CSE Administrator who informed Jones that plaintiff would need to complete an application and put her name on the Office of Administration's ("OA") reemployment register. In September 2000, plaintiff went to the Armour facility and asked to see Martha Morris. Morris was leaving for a meeting and told plaintiff that she did not have time to speak with her. Plaintiff then went to see Morris' supervisor, Jeannie Zumalt,

who was the Regional Program Manager for the Division of Social Services. Ms. Zumalt asked plaintiff if she had been told that she needed to complete a reinstatement form. When plaintiff responded that she had not been told this, Ms. Zumalt gave her the form and while plaintiff completed the form, Ms. Zumalt called Ms. Morris and told her to put plaintiff on the list for an interview. Plaintiff was one of thirteen candidates that interviewed for three open Clerk/Typist II positions. Plaintiff's interview score ranked her ninth out of the applicants, and she was not selected for any of the positions. After being denied her former position, plaintiff called the State and requested to have her name put on the register so that if anything came up, she would receive a letter inviting her to interview. Plaintiff received a letter inviting her to interview for a position at the Department of Mental Health. Plaintiff was employed in this position on November 20, 2000.

After being denied reemployment in her former position, plaintiff complained to LaRon Gillis and he told plaintiff she should speak with Felicia Green, because she might be able to speak with her supervisor, Valerie Davis. Ms. Davis was DCSE's Director of Field Operations. Plaintiff explained to Ms. Green her efforts at regaining reemployment and told her she felt that she was being subject to discrimination. In April 2001, Ms. Green spoke with Valerie Davis about plaintiff's denial of reemployment. On April 26, 2001, Ms. Davis spoke with Ms. Morris about plaintiff's attempts to regain employment. Ms. Morris indicated that while she would welcome plaintiff back, she had to spend more time training plaintiff than she had expected to and she also mentioned work quality and attendance issues.

On April 27, 2001, plaintiff was dismissed from her position at the Department of Mental Health. Plaintiff asserts that she told Davis that she had been dismissed from

2

this position. Davis offered plaintiff a position as a Clerk/Typist II. Plaintiff's start date was May 14, 2001. On May 9, 2001, Beverly Struemph, a personnel officer, sent plaintiff a letter confirming her acceptance of the position and stated that her salary would be $796 semi-monthly. On May 24, 2001, Ms. Struemph was contacted by the OA and told that plaintiff had recently been dismissed from the Department of Mental Health. Struemph was advised that plaintiff could not be reemployed in the same position from which she had just been dismissed. On May 30, 2001, Ms. Struemph called plaintiff and told her that she was being demoted from a Clerk Typist II to a Clerk II because she had failed to include on her job application that she had been dismissed from the Department of Mental Health.

Plaintiff states that Ms. Struemph was familiar with Mo.Rev.Stat. 36.380 which provides that if a director determines that the reason for an employee's dismissal shows that the dismissal did not reflect discredit on the character or the conduct of the employee, he may approve re-employment under Section 36.240 in any class in which the employee has held regular status. Plaintiff states that the reason she was dismissed from the Department of Mental Health was due to her inability to demonstrate an understanding of assigned tasks and an inability to pass the probationary working test. Thus, she argues she was eligible for reemployment as a Clerk/Typist II. When plaintiff was demoted to a Clerk II, she was dropped two steps or approximately $30.00 a month.

After interviewing, plaintiff was promoted to a Clerk III position on July 2, 2001. However, due to her demotion, plaintiff's starting pay for the promotional Clerk III position was lower than it would have been had she been promoted from the Clerk/Typist II position.

During the time that she worked for the Department of Mental Health, plaintiff

filed initial paperwork with the EEOC on March 5, 2001, alleging that she had been denied reemployment with DCSE due to her race and included a complaint of harassment. On July 16, 2001, plaintiff filed administrative charges with the EEOC and the Missouri Commission on Human Rights, alleging that she was denied re-employment for a Clerk/Typist II because of her race. Plaintiff subsequently filed additional charges of retaliation, disparate treatment and hostile work environment.

Plaintiff asserts that since her reemployment with DCSE, she has been harassed by Martha Morris. The harassment has included denying plaintiff's request to use a space heater in her workspace and warnings regarding her tardiness and attendance. Plaintiff also alleges that she was harassed when Ms. Morris asked her to operate the switchboard in another employee's absence. Plaintiff claims that this is primarily the responsibility of a Clerk II and that there are no other Clerk III's that are required to man the switchboard. Plaintiff also asserts that other employees in the office have spoken negatively about her, stating that she was lazy, incompetent and disrespectful. Plaintiff states that she believes that the disrespect by other employees is based on her race, as she has never heard the other employees speak to white employees in the same manner. Plaintiff also asserts that her car was vandalized when someone walked around it and scratched it with an object. Additionally, plaintiff states that on another occasion she had two flat tires on her car. Plaintiff states that she complained to Morris and Zumalt, but no action was taken to investigate the damage. Plaintiff also alleges that she was harassed when the time on her time card was changed by Ms. Morris. Morris told her that it had been changed because another supervisor saw her arrive later than what plaintiff indicated on her time card.

## II. STANDARD

A moving party is entitled to summary judgment on a claim only if there is a showing that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). If the moving party meets this requirement, the burden shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. 242, 248 (1986). In Matsushita Electric Industrial Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), the Court emphasized that the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts" in order to establish a genuine issue of fact sufficient to warrant trial. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. Matsushia, 475 U.S. 574, 588; Tyler v. Harper, 744 F.2d 653, 655 (8th Cir. 1984), cert. denied, 470 U.S. 1057 (1985).

## III. DISCUSSION

### A. Disparate Impact Claims and Retaliation Claims

After reviewing the parties' briefs, the authorities cited therein and the exhibits attached, the Court finds that there are disputed issues of fact which prevent the Court from granting defendant's Motion for Summary Judgment on Counts I, II, IV and V. Accordingly, defendant's Motion for Summary Judgment on these Counts is hereby **DENIED**.

### B. Hostile Work Environment Claims

Counts III and VI are the hostile work environment claims which plaintiff has asserted against both the DCSE and the individual defendants under both Title VII and §1981.

### 1. Exhaustion of Claims

Defendants argue that plaintiff did not administratively exhaust her hostile work environment claims because neither her charge of discrimination nor a supplement filed in August 2001 makes any mention of a hostile work environment. Additionally, defendants argue that plaintiff's hostile work environment claims are not sufficiently similar to fall within the shadow of her other claims or race discrimination or retaliation.

Plaintiff argues that her EEOC charges adequately plead a hostile work environment under Title VII. Plaintiff also notes that she does not have an exhaustion requirement under § 1981. Even under Title VII, plaintiff states that she administratively exhausted her claims because in her initial questionnaire, she completed the section entitled "Harassment" and responded affirmatively to the question which asked: "Do you believe that because of your race, color, sex, national origin, religion, pregnancy, age or disability you were subjected to conduct that unreasonably interfered with your job performance or created an intimidating, hostile or offensive work environment?" Based on her response to the question and the description of the problems in her questionnaire and the supplement which she filed, the Court finds that she has administratively exhausted her hostile work environment claim.

### 2. Hostile Work Environment Claim

> Title VII and §1981 claims alleging a hostile work environment are analyzed under an identical standard. . . . An employer violates Title VII if the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. . . . The claimant must show both that the offending conduct created an objectively hostile work environment and that he subjectively perceived the work environment to be hostile. . . . Whether an environment was objectively hostile or abusive must be judged by looking at the totality of the circumstances, including the frequency and severity of the discriminatory conduct, whether such conduct was physically threatening or humiliating, as opposed to mere offensive utterance, and whether the conduct unreasonably interfered with the employee's work performance.

Eliserio v. United Steel Workers of America Local 310, 398 F.3d 1071 (8th Cir. 2005)(internal citations and quotations omitted).

Plaintiff argues that her allegations of harassment are based on her race. However, defendants state that most of the alleged acts of harassment relate to plaintiff's interpersonal conflicts with her co-workers or her supervisor and have nothing to do with plaintiff's race. With regard to the space heater incidents, plaintiff admits that her supervisor gave her options to address this issue. As to the memorandums regarding her tardiness to work, plaintiff admits that other employees also received similar memos regarding their tardiness. As to the issue about damage to her car, plaintiff admits that other people also had damage done to their cars. Plaintiff was asked during her deposition:

Q. These things that we've been talking about that are harassing to you, do you think some or all of them are because you're black?
A. It could be because of my race or it just could be just because they don't like me. I don't know.
Q. Do you have any reason to think – any basis to think it might be because of your race?
A. I think some of the things done to the African-American people's cars and things of such is racial, yes.
Q. Other than the time [the] car you had from the dealer was keyed, anything else happen to your car?
A. Like I say, I had two flats I didn't know whether they were slashed or it just so

happened that, go in one minute, you come back out to come home and your tire is flat.

(Sudduth Depo. pp. 120-121).

Q. Any other reason to think any of these things we've been talking about as harassing behavior are due to your race?
A. What other things?
Q. We talked about calls being misdirected to you. Do you think that is because of your race?
A. I think it's harassment.
Q. Because of your race?
A. I wouldn't say because of my race.
Q. Being treated with disrespect by other employees?
A. I think that may be because of my race.
Q. Why do you think that?
A. I just never see them take that type of tone with white employees.
Q. How about being interrogated and called into your supervisor's office about things, do you think that is because of your race?
A. I think it may play a part of it, but harassment as well.
Q. But do you think the harassment was because of your race?
A. I couldn't say.

(Sudduth Depo. pp. 121-122).

In response plaintiff argues that looking at all the circumstances, including the fact that she was treated rudely by her co-workers, without management taking any corrective action, being accused of falsifying documents, having her car keyed, having her tires slit, being interrogated about her leave time, being accused of performing personal favors for clients, and having calls misdirected to her indicates that there is a genuine issue of material fact concerning her hostile work environment claim.

The Court disagrees. Plaintiff has failed to produce any evidence, other than her conclusory assertions, that any of the conduct she suffered was the result of any race based animus. Plaintiff alleges that her co-workers complained about her being lazy, incompetent and disrespectful, but there is no allegation that they were using racial epithets or racial slurs when referring to plaintiff. When questioned about it in her

8

Case 4:03-cv-00163-FJG   Document 142   Filed 09/28/05   Page 8 of 11

deposition, plaintiff even admitted that the comments and actions directed against her could just be because she was not well liked by her co-workers.

In Palesch v. Missouri Com'n. on Human Rights, 233 F.3d 560 (8th Cir. 2000), the plaintiff complained that her supervisor became biased against her when she wrote a memo complaining about the conduct of two co-workers. The plaintiff also complained that her co-workers and supervisors frequently ignored her, they did not include her in social activities, a co-worker damaged her car, shoved her against a wall and threatened her with bodily harm. The Court found that plaintiff failed to provide evidence of anything more than bare allegations that her co-workers or her supervisors harassed her because of her race or gender. The Court concluded:

> "[n]ot all unpleasant conduct creates a hostile work environment. Rather the plaintiff must show that she was singled out because of her gender [or race], and that the conduct was severe and pervasive." Williams v. City of Kansas City, Missouri, 223 F.3d 749, 753 (8th Cir. 2000). [Plaintiff] offers little more than speculation and conjecture to make the required connection from the mistreatment she alleges to a gender or race-based animus. [Plaintiff] has failed to create a material issue of fact concerning whether she was subjected to workplace harassment because of either her race or gender.

Id. at 567-568.

In the instant case, the Court finds that plaintiff likewise has not established that any of the conduct which she alleges she was subjected to was due to her race. Additionally, the Court finds that plaintiff has failed to show that the conduct affected a "term, condition or privilege of employment." As the Court stated in Gilooly v. Missouri Dept. of Health and Senior Services, No. 04-2460, 2005 WL 2086428, (8th Cir. Aug. 31, 2005), "[t]he conduct at issue must not be merely rude or unpleasant. . . . A plaintiff must establish harassment that is so intimidating, offensive, or hostile that it poisoned the work environment. . . . A plaintiff must be able to show that the workplace [was]

9

permeated with discriminatory intimidation, ridicule, and insult." Id. (internal citations and quotations omitted). In the instant case, plaintiff has not alleged conduct even approaching that which would be required to support a hostile work environment claim. Accordingly, the Court hereby **GRANTS** Defendants' Motion for Summary Judgment on plaintiff's hostile work environment claims (Counts III and VI).

### C. Motions in Limine

#### 1. Plaintiff's First Motion in Limine

Plaintiff requests that pursuant to Fed.R.Evid. 615, the Court should order the witnesses to be excluded so that they cannot overhear the testimony of other witnesses. Defendant did not file any opposition to this motion, therefore, the Court **GRANTS** plaintiff's First Motion in Limine (Doc. # 128).

#### 2. Plaintiff's Second Motion in Limine

Plaintiff in her second motion in limine asks that the Court exclude from evidence any mention of the fact that plaintiff had been diagnosed with trichomonas, a sexually transmitted disease. Plaintiff argues that testimony or evidence concerning her diagnosis or treatment would have an inflammatory effect on the jury and has limited probative value.

Defendants argue in response that during the same time that plaintiff is alleging discrimination, she learned that she had been infected and was treated. Defendants argue that plaintiff is claiming that the sole cause for her stress related symptoms was the discrimination she was suffering. Defendants state that testimony regarding alternative causes of plaintiff's stress are relevant and may also be relevant to plaintiff's credibility.

Plaintiff argues in reply that her key claim is that defendants failed to hire her in

10

the time period July 2000 through May 2001.  She states that she was not even diagnosed with trichomonas until three years after she initially sought re-employment.  Therefore, she argues that her diagnosis has absolutely no relevance and is inadmissible on her claim for emotional damages.  The Court agrees.  The Court finds that the diagnosis in August 2003 is too remote in time to be related to any emotional distress damages that plaintiff may be claiming.  Accordingly, the Court hereby **GRANTS** plaintiff's second motion in limine (Doc.# 129).  Defendants shall make no mention of plaintiff's diagnosis of trichomonas in voir dire, opening statement or at any other point during the trial of this case.

## IV. CONCLUSION

For the reasons stated above, the Court hereby **GRANTS in part and DENIES in part** Defendants' Motion for Summary Judgment (Doc. # 104); and

The Court **GRANTS** plaintiff's First Motion in Limine (Doc. # 128) and **GRANTS** plaintiff's Second Motion in Limine (Doc. # 129).


Date:  September 28, 2005                 **S/ FERNANDO J. GAITAN**, **JR.**
Kansas City, Missouri                        Fernando J. Gaitan, Jr.
                                                           United States District Judge